IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

CALVIN ELLISON,                 )
)
      Petitioner,            )
)
v.                               )            No. 1:18-cv-01001-STA-jay
)
BERT C. BOYD,           )
)
      Respondent.         )

ORDER DENYING § 2254 PETITION,
DENYING A CERTIFICATE OF APPEALABILITY,
AND
DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

Petitioner Calvin Ellison has filed a *pro se* habeas corpus petition (the "Petition"), pursuant to 28 U.S.C. § 2254. (ECF No. 1.) For the following reasons, the Petition is **DENIED**.

## BACKGROUND

In April 2013, the Madison County, Tennessee, grand jury charged Ellison with one count of attempted first-degree murder, two counts of aggravated assault, and one count of employing a firearm during the commission of or attempt to commit a dangerous felony—attempted first-degree murder. (ECF No. 14-1 at 5-10.) "Prior to trial, the State moved to prohibit the defense's expert witness from giving any testimony that commented on or evaluated evidence or testimony provided by another witness." *State v. Ellison*, No. W2013-02786-CCA-R3CD, 2014 WL 6977725, at *1 (Tenn. Crim. App. Dec. 10, 2014), *perm. appeal denied* (Tenn. June 17, 2015). The trial court granted the motion. *Id.* at *2. Finding that the "defense's witness was an expert in the field of ballistics, not videography," the court held that "he should be

1

precluded from judging the credibility of witnesses by comparing his findings to a video of the incident." *Id.* at *2. The court found that "such comments would invade the province of the jury to weigh the witnesses' credibility." *Id.*

At the jury trial, Joshua Cathey testified that in the early evening of December 22, 2011, his wife, Princess Cathey, accompanied him to a convenience store located near their home. *Id.* When they arrived, Mr. Cathey "parked on the side of the curb opposite the store." *Id.* While in the store, Mr. Cathey saw Ellison. *Id.* He recalled that he "made his purchase and left the store, and the Defendant followed him outside." *Id.* "[T]he Defendant stated, '[w]hat's up with that s* * *?'"—a comment "Mr. Cathey . . . believed . . . was a referenc[e] to a previous disagreement they had regarding the Defendant communicating with Mr. Cathey's wife." *Id.* After the witness "got into his vehicle, . . . the Defendant walked toward the car, pulled out a gun, and pointed it at Mr. Cathey." *Id.* Princess Cathey, "who was in the front seat, ducked down into the floorboard, and Mr. Cathey put his head down and drove away." *Id.* As he did so, "he heard 'several' gunshots—some of which struck the vehicle." *Id.* "Mr. Cathey . . . stat[ed] that the driver-side rear window [was] shattered, a bullet was lodged in the driver-side rear window frame, and the front passenger-side tire was flat." *Id.* "Mr. Cathey further testified that the Defendant was three to five feet away from the driver-side window when he saw the gun." *Id.*

"Through Mr. Cathey," the store's surveillance video from the night of the events was introduced into evidence. *Id.* at *2. The video revealed

> Mr. Cathey inside the store with the Defendant and other individuals. Additionally, the video show[ed] footage from an outside camera, which appear[ed] to show the parking area in front of the convenience store as well as a portion of the street. Footage from this angle show[ed] an individual, later identified by Mr. Cathey as the Defendant, come into the frame at the top of the screen. He appear[ed] to be running toward the convenience store from across the street. A car passe[d] immediately behind him and turns away from him. The Defendant turn[ed] around and raise[d] his arm toward the vehicle. The vehicle

2

then exit[ed] the screen on the upper left corner, and the Defendant exit[ed] the screen to the upper right corner.

*Id.*

Princess Cathey testified to the events at the convenience store, offering a description that was substantially the same as that of her husband. *Id.* at *3. "On cross-examination, [she] admitted that the Defendant could have been standing as close as two feet from the vehicle but maintained that 'he was close' and standing on the driver-side of the vehicle." *Id.*

"Officer Corey Insalaco with the Jackson Police Department testified that he responded to a call of a shooting[.]" *Id.* He recalled that the Cathey's vehicle had "damage to the . . . window frame and [he] stated that he pulled a bullet from the frame." *Id.* The officer acknowledged on cross-examination that "Mr. Cathey told him that the Defendant 'displayed a handgun and pointed it at him through the window.'" *Id.* In addition, "Mr. Cathey did not describe the Defendant as standing three to five feet away." *Id.*

"Officer Kevin Speck of the Jackson Police Department testified" that he found three spent shell casings "across the street from the convenience store," and he located a fourth shell "by the dumpster, closer to the convenience store." *Id.* "No weapon was recovered from the scene." *Id.*

"Investigator Daniel Long of the Jackson Police Department testified that he took Mr. and Mrs. Catheys' statements" and that he "spoke with the Defendant several days after the shooting." *Id.* The investigator recalled that Ellison told him "that he knew the Catheys and that he had a disagreement with Mr. Cathey over Facebook." *Id.* "The Defendant denied being at the convenience store on the night of the shooting, claimed that he did not own a firearm, and claimed that he had not shot at Mr. Cathey." *Id.*

Cervinia Braswell, a ballistics and firearm expert from the Tennessee Bureau of Investigation, testified that the recovered bullet "could have been fired from a .45 caliber gun," and that the shell casings were ".45 automatic cartridge cases" and "were fired from the same weapon." *Id.* at *4. She acknowledged, however, "that without the gun it was impossible to determine whether the bullet she received matched any of the shell casings she received." *Id.*

The defense called David Brundage, "an expert in the field of ballistics, trajectory analysis, and shooting scene reconstruction." *Id.* Brundage "described the surveillance video as showing

> an individual running across the street outside the convenience store. As the individual is running across the street, a vehicle comes across the screen immediately behind him, moving 'rapidly.' The individual turns and faces the vehicle, and the vehicle narrowly avoids hitting the individual. Then the individual steps out of the screen to the upper right, and the vehicle leaves the screen to the upper left. Brundage also stated that the video showed the individual raise his arm as he turned toward the vehicle, but he could not determine if the individual had anything in his hand or see any indication that shots were fired. Had shots been fired, Brundage said that he would expect to see flashes of light on the video.

*Id.* Brundage also "concluded that it would not be plausible for a bullet to damage the front passenger-side tire if the shooter had been standing five feet from the driver-side window," and that, "[i]n order for such damage to occur, the shooter would have to be standing on the passenger-side of the car." *Id.* "At the end of the defense's direct examination, counsel asked whether, based on the ballistic evidence, Brundage thought Mrs. Cathey's account was consistent with his findings." *Id.* The State's objection to the question was sustained by the trial court. *Id.* The expert acknowledged on cross-examination that he was not given a "crime scene diagram," did not visit the crime scene, and "did not examine any of the physical evidence in the case." *Id.*

The defendant's friend, "Lewis Grimes, III testified that he was with the Defendant when the shooting took place." *Id.* at *5. He recalled that it was Mr. Cathey who "followed them

outside" the store, telling Ellison to "quit calling my woman[.]"  *Id.*  He further testified that Mr. Cathey "called the Defendant 'a b* * * * a* *n* * * * *.'"  *Id.*  According to Grimes, Ellison "did not respond."  *Id.*  The witness stated that "Mr. Cathey got into his vehicle and then drove toward the Defendant as if he was going to strike the Defendant with his vehicle."  *Id.*  He insisted that it was only "[a]t that point [that] the Defendant discharged his weapon," and he "maintained the Defendant was never near the Catheys' vehicle until it approached" him.  *Id.*  "[I]nstead, [the defendant] was near the dumpster located next to the store throughout the entire incident."  *Id.*

Ellison testified that "he was at the convenience store with Mr. Grimes when Mr. Cathey came in."  *Id.*  He stated that "Mr. Cathey said something to" him, but he "could not recall what was said but stated that he stepped away to avoid a confrontation."  *Id.*  He insisted that Mr. Cathey followed him outside and told him "'I got you b* * * *a* * n* * * * *,' [and] got into his vehicle, and drove toward the Defendant."  *Id.*  Ellison testified that he thought he would be struck by the vehicle had he "not drawn his weapon and fired."  *Id.*  He insisted that "he did not draw his weapon until Mr. Cathey's vehicle approached him and only did so in self-defense."  *Id.*  The defendant also recalled that he was in front of Mr. Cathey's car at the time he "drew his weapon, and [that] his weapon was pointed toward the ground when he fired the first shot."  *Id.*  He conceded that he "was intoxicated at the time of the shooting."  *Id.*

On cross-examination, Ellison stated that he never told law enforcement "he was not at the convenience store on the night in question."  *Id.*  He insisted "that he did not tell the police he had acted in self-defense when they questioned him because the warrant for his arrest had already been issued."  *Id.*  He said he thought "it was better to wait until he had been appointed counsel to assert a claim of self-defense."  *Id.*

Ellison was found "guilty on the lesser-included charge of reckless endangerment for count one; guilty of aggravated assault for count two; not guilty of aggravated assault for count three; and guilty of unlawful employment of a firearm during the commission of or attempt to commit attempted first degree murder for count four." *Id.* *6. He was sentenced to consecutive sentences of six years' imprisonment for the aggravated assault conviction and ten years for the firearm conviction. (ECF No. 14-1 at 120-24.) Petitioner took an unsuccessful direct appeal, *see Ellison*, 2014 WL 6977725, at *12, and the Tennessee Supreme Court denied discretionary review (*see* ECF No. 14-10).

Petitioner filed a *pro se* petition and amended petition for state post-conviction relief. (ECF No. 14-11 at 3-10, 21-23.) Appointed counsel filed a second amended petition. (*Id.* at 38-39.) The post-conviction court conducted an evidentiary hearing and denied relief. (*Id.* at 46-47.) On appeal, the Tennessee Court of Criminal Appeals ("TCCA") affirmed the lower court's decision. *Ellison v. State*, No. W2016-01784-CCA-R3-PC, 2017 WL 2472374, at *1 (Tenn. Crim. App. June 7, 2017), *perm. appeal denied* (Tenn. Oct. 6, 2017). The Tennessee Supreme Court denied discretionary review. (ECF No. 14-19.)

## DISCUSSION

Ellison filed the Petition on January 2, 2018. He asserts that the trial court erred when it "precluded [his ballistics expert] from commenting on Mrs. Chathey's prior statement in relation to his findings" (Claim1), the guilty verdicts on reckless endangerment and the firearm offense are "mutually exclusive" (Claim 2), the evidence was insufficient to support the convictions (Claim 3), trial counsel was ineffective in four ways (Claim 4), the State engaged in prosecutorial misconduct (Claim 4), and post-conviction counsel was ineffective in failing to

investigate the case (Claim 6).[1]   (ECF No. 1 at 5, 6, 8, 10; ECF No. 1-1 at 18, 21-23, 28.)   On April 23, 2018, Respondent Bert C. Boyd filed the state court record (ECF No. 14) and his Response to the Petition (ECF No. 15).   He argues that the claims are, variously, non-cognizable, procedurally defaulted, and without merit.   Petitioner did not file a reply, although allowed to do so.

## I.   Legal Standards

### A.  Federal Habeas Review

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA").   *See* 28 U.S.C. § 2254.   Under § 2254, habeas relief is available only if the prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The availability of federal habeas relief is further restricted where the petitioner's claim was "adjudicated on the merits" in the state courts.   28 U.S.C. § 2254(d).   In that circumstance, the federal court may not grant relief unless the state-court decision "'was contrary to' federal law then clearly established in the holdings of [the Supreme] Court; or . . . 'involved an unreasonable application of' such law; or . . . 'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting 28 U.S.C. § 2254(d)(1)-(2)) (citations omitted)).

A state court's decision is contrary to federal law when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or when "the state court confronts

---

[1]  The Court has liberally construed the Petition as encompassing the additional grounds set forth in Ellison's supporting memorandum.   For clarity's sake, the Court has also adopted Respondent's renumbering of the claims.

facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an "opposite" result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). An unreasonable application of federal law occurs when the state court, having invoked the correct governing legal principle, "unreasonably applies the . . . [principle] to the facts of a prisoner's case." *Id.* at 409.

For purposes of § 2254(d)(2), a state court's "factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). The Sixth Circuit construes § 2254(d)(2) in tandem with § 2254(e)(1) to require a presumption that the state court's factual determination is correct in the absence of clear and convincing evidence to the contrary. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). A state court's factual findings are therefore "only unreasonable where they are 'rebutted by clear and convincing evidence and do not have support in the record.'" *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (*quoting Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted).

Before a federal court will review the merits of a claim brought under § 2254, the petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To be properly exhausted, a claim must be "fairly presented" through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 848 (1999).

The exhaustion requirement works in tandem with the procedural-default rule, which generally bars federal habeas review of claims that were procedurally defaulted in the state courts. *Id.* at 848. A petitioner procedurally defaults his claim where he fails to properly exhaust

8

available remedies (that is, fails to fairly present the claim through one complete round of the state's appellate review process), and he can no longer exhaust because a state procedural rule or set of rules have closed-off any "remaining state court avenue" for review of the claim on the merits. *Harris v. Booker*, 251 F. App'x 319, 322 (6th Cir. 2007). Procedural default also occurs where the state court "actually . . . relied on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citing *Fox Film Corp. v. Muller*, 296 U.S. 207, 210 (1935); *Klinger v. Missouri*, 80 U.S. 257, 263 (1871)).

A petitioner will be entitled to federal court review of the merits of a claim that was procedurally defaulted is he demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" *Id.* at 750. The ineffectiveness of post-conviction trial counsel may be cause to excuse the default of an ineffective-assistance-of-trial-counsel claim. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez v. Ryan*, 566 U.S. 1, 14, 16-17 (2012)).

A petitioner may also overcome his procedural defaults by establishing a "gateway" claim of actual innocence. *Schlup v. Delo*, 513 U.S. 298, 315 (1995). To open the gateway, a prisoner must "support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. He must also show that, in light of the new evidence, "it is more likely than not that no reasonable juror would have convicted him." *Id.* at 327.

### B.  Sufficiency of the Evidence

The Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), provides the federal due process standard for evidentiary sufficiency in criminal cases.  *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) (holding *Jackson* applies to sufficiency-of-the-evidence claims on habeas review under § 2254(d)).  In *Jackson*, the Supreme Court announced that "the relevant question" "on review of the sufficiency of the evidence to support a criminal conviction," is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 318-19 (emphasis in original).

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to ultimate facts."  *Id.* at 319.  *See also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) (holding that, under *Jackson*, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.").  *Jackson*'s evidence-sufficiency standard may be met with circumstantial evidence.  *See Desert Palace, Inc., v. Costa*, 539 U.S. 9, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *see also United States v. Algee*, 599 F.3d 506, 512 (6th Cir. 2010) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.").

The AEDPA adds a layer of deference to *Jackson*'s already deferential standard.  By virtue of the AEDPA's command that federal habeas relief may issue only if the state court's decision is "contrary to" controlling federal law or "based on an unreasonable application" of the

controlling federal law, 28 U.S.C. § 2254(d)(1)-(2), a state court determination that the evidence satisfied the deferential *Jackson* standard is itself "entitled to considerable deference" by the federal habeas court. *Coleman*, 566 U.S. at 656.

### C.  Ineffective Assistance of Counsel

A claim that an attorney's ineffective assistance has deprived a criminal defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed on such a claim, a petitioner must demonstrate two elements: (1) "that counsel's performance was deficient"; and (2) "that the deficient performance prejudiced the defense."  *Id.* at 687.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 686.

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  A court considering a claim of ineffective assistance must apply "a strong presumption" that the attorney's representation was "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* at 689 (internal quotation marks and citation omitted).

An attorney's "strategic choices" are "virtually unchallengeable" if based on a "thorough investigation of law and facts relevant to plausible options[.]"  *Strickland*, 466 U.S. at 690.  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id.* at 690-91.

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693) (citations omitted). Instead, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

The deference to be accorded a state-court decision under 28 U.S.C. § 2254(d) is magnified when a federal court reviews an ineffective assistance claim:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 105.

## II.    Claim 1

Petitioner asserts that the trial court erroneously excluded a portion of his expert's opinion. Respondent posits that the claim is non-cognizable and also without merit. The Court agrees.

As discussed above, Petitioner's ballistics expert testified at trial that the front passenger tire could not have been struck by a bullet if, as the State's witnesses testified, Ellison was standing at the driver's side of the car during the shooting. The trial court granted the State's motion to exclude from evidence the defense expert's further opinion that the testimonies of the State's witnesses were inconsistent with his opinion about "the relative position of the shooter to

12

the damage on the vehicle." *Ellison*, 2014 WL 6977725, at *7. In his direct appeal, Ellison argued that the trial court's ruling was improper under Tennessee Rules of Evidence 702 and 703. (ECF No. 14-6 at 17-18.) The TCCA rejected the argument, finding that the lower court properly applied the state rules of evidence:

> Under Tennessee Rule of Evidence 702, an expert's testimony must substantially assist the jury to determine a fact at issue. Brundage's scientific findings fall under this requirement insofar as his findings explain the relative position of the shooter to the damage on the vehicle. However, any comments he may have had regarding the credibility of other witnesses invades the province of the jury. Questions of witness credibility are exclusively resolved by the fact-finder. As such, we hold that the trial court did not abuse its discretion when it excluded Brundage's testimony regarding the consistency of his findings with the testimony of other witnesses.

*Ellison*, 2014 WL 6977725, at *7.

To the extent Petitioner is asserting that the TCCA's decision is unreasonable, the claim is not cognizable in this § 2254 proceeding. It is well-established that federal habeas corpus relief is not available "for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). The state appellate court's decision rejecting Claim 1 was grounded only on state evidentiary rules. The claim is therefore subject to dismissal as non-cognizable.

Insofar as Ellison might mean to assert that Claim 1 invokes a federal constitutional provision, such as the due process clause,[2] the claim is procedurally defaulted. As indicated above, a habeas petitioner must "fairly present[]" his federal claim to the state courts. *Boerckel*, 526 U.S. at 848. "To 'fairly present' a federal claim, the petitioner must plead both a factual and legal basis for the claim." *Katt v. Lafler*, 271 F. App'x 479, 481–82 (6th Cir. 2008)

---

[2] "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff,* 518 U.S. 37, 43 (1996)).

13

(quoting *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000)).   In assessing whether a petitioner has done so, a court must scrutinize the petitioner's state court filings for

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*McMeans*, 228 F.3d at 681.

Petitioner's direct appeal brief did not present a federal constitutional claim regarding the exclusion the defense expert's testimony.  The brief's "ISSUES PRESENTED FOR REVIEW" framed the issue on appeal this way: "Whether the trial court erred in granting the State's Motion to Prohibit Expert Testimony that Comments on Evidence or Testimony?"  (ECF No. 14-6 at 5.)  The issue presented was not phrased in terms of federal constitutional law and it did not employ terms that would be sufficient to allege a violation of a constitutional right.  Consistent with the issue statement, the argument section of the brief advanced only state-law reasons why the trial court erred in excluding a portion of the defense expert's testimony.  (ECF No. 14-6 at 17 (citing Tenn. R. Evid. 702 and 703).)  The brief did not employ constitutional analysis or allege facts well within the mainstream of constitutional law.

Because Petitioner did not fairly present a federal constitutional argument regarding the alleged trial-court error, any such argument is procedurally defaulted.  Petitioner has not asserted cause and prejudice to excuse the default.  And although he alleges, without elaboration, that he is innocent of the firearm offense (*see* ECF No. 1-1 at 8), he has not identified any newly discovered evidence to support that assertion.  Claim 1 is **DISMISSED.**

### III.    Claim 2

Petitioner asserts in Claim 2 that two of his convictions are "mutually exclusive."  (ECF No. 1 at 6.)  He raised the issue in his direct appeal, arguing "that his conviction for employing a firearm during the commission of a dangerous felony should be overturned because the jury failed to convict him of the underlying felony, attempted first degree murder."  *Ellison*, 2014 WL 6977725, at *7.  Respondent maintains that the TCCA's rejection of the argument meets the AEDPA's standards.  That position is correct.

The TCCA first determined that Petitioner's convictions were inconsistent, not mutually exclusive.  *Id.* at *7-8, 9.  Verdicts are mutually exclusive "when 'a guilty verdict on one count logically excludes a finding of guilty on the other.'"  *Id.* at *7 (quoting *State v. Chris Jones,* No. W2009–01698–CCA–R3–CD, 2011 WL 856375, at *10 (Tenn. Crim. App. March 9, 2011), *perm. app. denied* (Tenn.   Aug. 25, 2011)).   In that situation, "the jury 'necessarily reache[s] two positive findings of fact that cannot logically mutually exist.'" *Id.* (quoting *Chris Jones*, 2011 WL 856375 at *10) (alterations in original).  Inconsistent verdicts, on the other hand, "arise when a defendant is convicted of one offense and acquitted of another offense, although both offenses arose from the same criminal transaction."  *Id.* at *8 (quoting *State v. James Snipes*, No. W2011-02161-CCA-R3-CD, 2013 WL 1557367, at *8 (Tenn. Crim. App. April 12, 2013), *perm. appeal denied* (Tenn. Sept. 13, 2013)).  The TCCA found that the verdicts in Ellison's case met the definition of inconsistent verdicts because the jury found Petitioner guilty of the firearm offense and not guilty on the attempted first-degree murder charge.  *Id.* at *9.

Rejecting Ellison's argument that the verdicts were unconstitutional, the TCCA noted that "[i]nconsistent verdicts have long been permitted in both the state and federal systems."  *Id.*

at *8 (discussing *Dunn v. United States,* 284 U.S. 390 (1932) and *United States v. Powell,* 469 U.S. 57 (1984)).  That is so, the court held, "even [for] verdicts," such as Ellison's, "that acquit on a predicate offense while convicting on the compound offense[.]"  *Id.* (quoting *Powell,* 469 U.S. at 65) (emphasis omitted)).

The TCCA's decision is not based on unreasonable determinations of fact and is not contrary to, or an unreasonable application of, clearly-established Supreme Court law.  Petitioner has not identified any factual determinations that he believes are unreasonable in light of the state-court record.  In addition, the appellate court correctly determined that the verdicts—one of which was an acquittal and the other a finding of guilt—were not mutually exclusive, but rather, inconsistent.  *See United States v. Randolph*, 794 F.3d 602, 609–11 (6th Cir. 2015) (quoting *United States v. Ruiz,* 386 F. Appx. 530, 533 (6th Cir. 2010)) (defining "mutually exclusive" verdicts as "a situation 'where a guilty verdict on one count necessarily excludes a finding of guilt on another[.]'")  And, as the TCCA noted, there is no Supreme Court law holding that inconsistent verdicts are unconstitutional.  To the contrary, the Supreme Court has "alluded to [the] rule" in *Dunn*—"that a criminal defendant may not attack a jury's finding of guilt on one count as inconsistent with the jury's verdict of acquittal on another count"—"as an established principle."³  *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 359 (2016).  More specifically, as pertains to Ellison's compound firearms conviction, *Powell* dictates that the inconsistency between the finding of guilt on that offense and the acquittal on the predicate charge of attempted

---

³  The Sixth Circuit has recognized an exception for "jury verdicts [that] 'are marked by such inconsistency as to indicate arbitrariness or irrationality[.]'"  *Randolph*, 794 F.3d at 610 (quoting *United States v. Lawrence*, 555 F.3d 254, 263 (6th  Cir. 2009)).  Even if the Sixth Circuit's ruling reflected clearly-established Supreme Court law, there is nothing in the state-court record to indicate that the verdicts in Ellison's case were arbitrary or irrational.

first-degree murder does not rise to a constitutional violation.  *See Powell*, 469 U.S. at 65.  Claim

2 is therefore without merit and is **DENIED**.

**IV.      Claim 3**

Petitioner asserts that the evidence was insufficient to sustain his convictions.  He raised

the issue on direct appeal, arguing that the evidence "support[ed] the theory that he acted in self-

defense."  *Ellison*, 2014 WL 2014 WL 6977725, at *10.  The TCCA rejected the argument.  *Id.*

at *10-11.  Respondent maintains that the TCCA's decision passes muster under the AEDPA's

deferential standards.

"A person commits reckless endangerment when he or she 'recklessly engages in

conduct that places or may place another person in imminent danger of death or serious bodily

injury.'"  *Id.* (quoting Tenn. Code Ann. § 39–13–103).  In assessing the sufficiency of the

evidence to convict Ellison of that offense, the TCCA identified *Jackson*'s standards as

governing its analysis and applied those standards to the facts adduced at trial.  *Id.*  "Viewing the

evidence in a light most favorable to the State," the TCCA found that

> the Defendant discharged his firearm in the direction of Mr. Cathey's vehicle
> when he knew Mr. Cathey was inside the vehicle. Two of the bullets struck Mr.
> Cathey's rear driver-side window and window frame respectively. At trial, the
> Defendant argued he acted in self-defense, but the jury clearly discredited his
> testimony and returned a verdict of guilty. Because we will not reweigh the
> evidence or question the jury's credibility determinations upon review, we hold
> that the evidence is sufficient to support the Defendant's conviction for reckless
> endangerment.

*Id.*

The appellate court also held that Petitioner's aggravated assault conviction was

supported by the evidence.  "[U]nder Tennessee law, 'A person commits assault who ... (2)

[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury.'"  *Id.* *11

(quoting Tenn. Code Ann. § 39–13–101(a)(2)) (alterations in original).  "A person commits

aggravated assault when he '[i]ntentionally or knowingly commits an assault as defined in § 39–13–101 and ... (B) [u]ses or displays a deadly weapon.'" *Id.* (quoting Tenn.Code Ann. § 39–13–102(a)(1)(B)) (alterations in original). "Viewing the evidence in a light most favorable to the State," the TCCA found that,

> Mr. Cathey saw the Defendant point a gun in his direction, and he drove away in an attempt to remove himself from danger. The Defendant discharged his weapon, striking Mr. Cathey's vehicle. We find that the evidence is sufficient to support the Defendant's conviction for aggravated assault.

*Id.*

With regard to Ellison's firearm conviction, the TCCA first reviewed the statutory definition of the offense and the elements of the predicate crime of attempted first-degree murder:

> Under Tennessee law, "[i]t is an offense to employ a firearm during the: (1) [c]ommission of a dangerous felony; [or] (2) [a]ttempt to commit a dangerous felony." Tenn.Code Ann. § 3917–1324(b)(1)–(2) (2010). . . . "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense: ... (2) [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or (3) [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39–12–101(a)(2)–(3).  First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39–13–202(a)(1) (2010).

*Id.* (brackets in original).  The TCCA determined that, when "[v]iewed in a light most favorable to the State,"

> [t]he evidence presented at trial established that the Defendant had previously had a disagreement with Mr. Cathey over Facebook. On the night of the shooting, the Defendant followed Mr. Cathey out of the convenience store to his vehicle, pointed a gun at Mr. Cathey, and fired the weapon at Mr. Cathey's vehicle as Mr. Cathey drove away. Two of the bullets struck the rear driver-side window and window frame of the vehicle respectively—indicating that the Defendant was aiming at the person inside. Three spent shell casings were found across the street

18

from the store where the Catheys' vehicle was parked; one spent shell casing was found near the dumpster. The Defendant argues that he was acting in self-defense as a result of Mr. Cathey's attempting to strike him with his vehicle, and he did not intend to try to kill Mr. Cathey when he fired the shots. However, the jury credited Mr. Cathey's version of events by returning a verdict of guilty for the offense of employing a firearm during the commission of a dangerous felony.

*Id.* The court therefore concluded that the evidence was sufficient to support the firearm conviction. *Id.*

As indicated above, the TCCA correctly identified *Jackson*'s standards and applied them to the facts adduced at Petitioner's trial. Ellison therefore cannot show that the court's evidence-sufficiency determinations are contrary to clearly established Supreme Court law. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

Petitioner has also failed to establish that the appellate court's conclusions, and the factual determinations on which they are based, are unreasonable. He does not identify any clear and convincing evidence to undermine the factual findings, including the jury's implicit determinations that the victims' testimonies about the events were credible and that his own testimony and that of Grimes were not. *See McMullan v. Booker*, 761 F.3d 662, 671 (6th Cir. 2014) (credibility determinations are factual findings for purposes of AEDPA review) (citing *Thompson v. Keohane,* 516 U.S. 99, 110 (1995)). The jury was tasked with assessing the credibility of the witnesses and resolving the conflicts in the evidence. Consistent with *Jackson*'s commands, the TCCA gave "full play" to the jury's role. *Jackson*, 443 U.S. at 319. Its conclusion that the evidence was sufficient to sustain Ellison's convictions is, therefore, not the result of an unreasonable application of *Jackson*'s standards. Claim 3 is **DENIED**.

## V.      Claims 4A, 4B, and 4C

Petitioner asserts that counsel provided ineffective assistance by failing to call an expert witness on the issue of eyewitness reliability (Claim 4A), move to suppress the eyewitness photograph identification (Claim 4B), and move to suppress his statement to law enforcement (Claim 4C).  Respondent argues that the claims are procedurally defaulted.  The argument is well-taken.

Ellison did not raise these issues in his post-conviction appeal (*see* ECF No. 14-14 at 16-22), and the time for doing so has passed.  The claims are therefore procedurally defaulted.

Petitioner does not assert cause and prejudice to excuse the defaults, and his conclusory allegation that he actually innocent of the firearm offense is insufficient to overcome them. Therefore, Claims 4A, 4B, and 4C are barred from review in this federal habeas proceeding and are **DISMISSED**.

## VI.     Claim 4D

Petitioner asserts that counsel rendered ineffective assistance by failing to investigate and challenge the imposition of consecutive sentences relating to his convictions for aggravated assault and employing a firearm during the commission of a dangerous felony.  (ECF No. 1-1 at 7-8.)  He insists that he "would not have received consecutive sentencing" had counsel not performed deficiently.  (*Id.* at 8.)  He raised the claim in his direct appeal, but the TCCA rejected it.  *See Ellison*, 2017 WL 2472374, at *6.  Respondent argues that the TCCA's decision easily meets AEDPA's deferential standards.  The Court agrees.

In denying the claim, the TCCA identified *Strickland*'s standards and applied them to the facts adduced in the criminal trial and the post-conviction hearing.  *See id.* at *4.  The court

found that counsel and the trial court were mistaken, as a matter of law, that consecutive sentencing was mandatory under Tennessee law in the circumstances of Ellison's case. *Id.* at *6. The court concluded, however, that Petitioner had not shown that he was prejudiced by counsel's error because he "failed to establish 'a reasonable probability that, but for counsel's unprofessional errors," the trial court would have imposed concurrent sentences. *Id.* The court found that Petitioner could not demonstrate a reasonable probability of success because he did not submit the sentencing transcript in the court below or on appeal. *Id.* In addition, his "extensive criminal history that spanned the entirely of his adult life" was a "permissive ground[]" that could warrant the consecutive sentences. *Id.* (citing Tenn. Code Ann. § 40-35-115).[4] *Id.*

As indicated above, the TCCA identified and applied *Strickland*'s standards. Its rejection of Petitioner's claim is therefore not contrary to clearly established Supreme Court law. *See Williams*, 529 U.S. at 406.

Nor is its ruling based on unreasonable factual determinations or an unreasonable application of *Strickland*'s precepts. Petitioner does not identify any clear and convincing evidence to undermine the court's factual finding that the sentencing transcript was not produced in the record below or on appeal.[5] Nor has he sought to challenge the finding that he has an extensive criminal history. In fact, the State's enhanced punishment notice, which was submitted as an exhibit at the post-conviction hearing, supports that finding. (*See* ECF No. 14-13 at 8-9.)

---

[4]   Tenn. Code Ann. § 40-35-115 enumerates seven permissive reasons for the imposition of consecutive sentencing, including the ground that "[t]he defendant is an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2).

[5]   Petitioner moved to expand the record in the present case to include the sentencing transcript. (ECF No. 18.)  By order dated April 25, 2019, the Court denied the motion because, under the AEDPA, a federal court's "review under [28 U.S.C.] § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim."  (ECF No. 21 at 2 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)).

Based on the record before it, the TCCA's conclusion that Petitioner failed to show that he was prejudiced by counsel's conduct was not unreasonable.  Claim 4D is **DENIED**.

## VII.    Claim 5

Petitioner asserts that that the State engaged in prosecutorial misconduct by failing to "disclos[e] information that was beneficial to [him] concerning [his] conviction[s] and sentence." (ECF No. 1-1 at 9.)  Respondent argues that the claim is procedurally defaulted and is without merit "[t]o the extent [it] is subsumed by Petitioner's related claim of ineffective assistance of counsel in his post-conviction appeal[.]"  (ECF No. 15 at 29.)  The Court agrees.

As a stand-alone assertion of prosecutorial misconduct, the claim was not exhausted in the state courts.  It is therefore procedurally defaulted.  Petitioner does not assert cause and prejudice to excuse the default, and his conclusory allegation of actual innocence is insufficient to overcome it.

Insofar as Petitioner means to assert that counsel was ineffective in failing to raise an argument on direct appeal that the prosecutor engaged in misconduct by carrying out a vendetta against him, that issue was exhausted by virtue of his having raised it in his post-conviction appeal.  *See Ellison*, 2017 WL 2472374, at *4.  However, the TCCA's rejection of the claim meet AEDPA's standards.

At the post-conviction hearing, Ellison testified that the prosecutor superseded the indictment as a vendetta against him for having assaulted a sheriff's deputy who was the prosecutor's cousin.  (ECF No. 14-12 at 9-10.)  The post-conviction trial court denied the claim. The court found that Ellison's allegation of a vendetta was not supported by specific facts.  The court also noted that it had granted counsel's motion at the criminal trial to replace the assistant district attorney.  (*Id.* at 67.)

On appeal, the TCCA affirmed the lower court's decision, finding that Petitioner did not establish a factual basis for the charge of misconduct:

> The petitioner failed to present a single item of evidence at the post-conviction hearing to support his claim that the charges in this case were filed as a personal vendetta against him by a rogue assistant district attorney general who continued to exert a nefarious influence over the proceedings even after the trial court granted counsel's motion to remove that particular assistant district attorney general. In consequence, there is no merit to his contention that this claim should have been raised on direct appeal.

*Ellison*, 2017 WL 2472374, at *4.

The TCCA's decision easily meets the AEDPA's deferential standards. To begin, the opinion is not contrary to clearly-established Supreme Court law because the appellate court applied Strickland's standards to the facts adduced in the court below. *See Williams*, 529 U.S. at 406. The decision is also not based on an unreasonable determination of the facts. A review of the post-conviction hearing transcript supports the TCCA's determination that Petitioner's testimony about a vendetta was merely speculative and not supported by specific facts. (ECF No. 14-12 at 9-10.) Because an argument charging prosecutorial misconduct would have been without merit, counsel's failure to raise the issue on direct appeal was not deficient performance and his conduct did not prejudice Ellison. The TCCA's conclusion that counsel did not render ineffective assistance is therefore patently reasonable. Claim 5 is **DENIED**.

## VIII.  Claim 6

Petitioner asserts that post-conviction counsel provided ineffective assistance by failing to properly investigate his case and to introduce the sentencing hearing transcript as evidence at the post-conviction hearing. (ECF No. 1-1 at 18, 28.) The claim is non-cognizable in federal habeas because "[t]here is no constitutional right to an attorney in state post-conviction proceedings." *Coleman*, 501 U.S. at 752. Claim 6 is therefore **DISMISSED**.

For all of the foregoing reasons, the Petition is **DENIED**.  Judgment shall be entered for Respondent.

## APPEAL ISSUES

A § 2254 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right.   28 U.S.C. § 2253(c)(2)-(3).   A substantial showing is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  "If the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'"  *Dufresne v. Palmer*, 876 F.3d 248, 252-53 (6th Cir. 2017) (per curiam) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists would not debate the correctness of the Court's decision to deny the Petition.  Because any appeal by Petitioner does not deserve attention, the Court DENIES a certificate of appealability.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.  Fed. R. App. P. 24(a).  However, Rule 24(a) also provides that if the district court certifies that an appeal

would not be taken in good faith, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court.  *Id.*

In this case, for the same reason it denies a COA, the Court CERTIFIES, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith.  Leave to appeal *in forma pauperis* is therefore DENIED.[6]

**IT IS SO ORDERED**.

s/ S. Thomas Anderson
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: April 21, 2021.

---

[6] If Petitioner files a notice of appeal, he must also pay the full $505.00 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days.